IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JENNIFER WOODY,<br><br>Defendant. | ) | Case No. 8:09CR382<br><br><br><br>SENTENCING MEMORANDUM |

This Sentencing Memorandum supplements findings made on the record at defendant's sentencing hearing on July 8, 2010.

## I. BACKGROUND

Defendant Jennifer Woody was charged with knowingly and intentionally conspiring to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Filing No. 1, Indictment. The offense carries a statutory term of imprisonment of ten years to life. Pursuant to a plea agreement, Woody entered a plea of guilty to the conspiracy charge. Filing No. 128, Plea Agreement; Filing No. 125, Text Minute Entry. In the plea agreement, the parties agreed that Woody should be held responsible beyond a reasonable doubt for at least 500 grams but less than 1.5 kilograms of methamphetamine and agreed that her base offense level under the United States Sentencing Guidelines ("Guidelines") was 32. Filing No. 128, Plea Agreement at 4. The agreement contemplated cooperation by Woody and eventual consideration of the cooperation by the government in connection with a motion to reduce sentence under U.S.S.G. § 5K1.1, 18 U.S.C. § 3553(e), or Fed. R. Crim. P. Procedure 35(b). Woody agreed not to move for a downward

departure based on U.S.S.G. §§ 5H1.1-5H1.12 and/or 5K2.0-5K2.23 or a variance or deviation from the Guidelines. The court accepted Woody's plea but deferred acceptance of the plea agreement pending the preparation of a Presentence Investigation Report ("PSR") by the United States Office of Probation ("the Probation Office") that calculated the defendant's sentence under the Guidelines. Filing No. 125, Text Minute Entry.

In the PSR, the Probation Office identified U.S.S.G. § 2D1.1 as the applicable Guidelines base offense level provision and determined that, based on a quantity determination of more than 500 grams but less than 1.5 kilograms of methamphetamine, the defendant's base offense level should be 32, but that Woody was entitled to an adjustment under U.S.S.G. § 3B1.2 for a mitigating role in the offense, reducing the base offense level to 30, under U.S.S.G. § 2D1.1(a)(5)(B)(I). Filing No. 173, PSR (sealed) at 9. It also found a two-level downward adjustment for role in the offense under U.S.S.G. § 3B1.2(b) was applicable, noting that "[e]vidence suggests that the defendant was handling user quantities of methamphetamine," resulting in an adjusted offense level of 28. *Id.* at 8.

The Probation Office found, however, that Woody is considered a career offender because she was at least 18 years old at the time of the instant offense, the instant offense is a felony controlled-substance offense, and she has one felony conviction for a controlled substance offense and one felony conviction for a crime of violence. *Id.* at 9; *see* U.S.S.G. § 4B1.1(a). Woody was convicted in this court of conspiracy to possess with intent to distribute methamphetamine in 2001 and was convicted in Douglas County, Nebraska District Court of burglary in 2009. *Id.* at 10-11. Since the statutory maximum penalty for the instant offense is life, the probation office determined that Woody's offense level is 37 under U.S.S.G. § 4B1.1(b)(A).

*Id.* at 9. The Probation Office then subtracted three levels for the defendant's acceptance of responsibility under U.S.S.G. § 3E1.1 (a) & (b), resulting in an offense level of 34. *Id.*

Based on the assessment of 8 total criminal history points (3 for her convictions for distribution of methamphetamine, 1 for burglary of a storage shed, 1 for possession or use of drug paraphernalia, 2 for committing the crime while under a sentence of probation, and 1 for committing the crime less than two years after release from imprisonment), Woody's criminal history category would be IV. *Id.* at 12. However, under U.S.S.G. § 4B1.1, Woody's classification as a career offender places her in criminal history category VI. *Id.* At criminal history category VI and offense level 34, Woody's sentencing range under the Guidelines is 262 months (nearly 22 years) to 327 months (over 27 years).

The following facts are set out in the PSR. *See id.* at 5-6. Omaha police officers were executing a search warrant at the apartment of Woody's co-defendants, Roseann Crisman and Christopher Day, where they recovered 20.5 grams of methamphetamine and $2,883.00 in cash. *Id.* at 5. While the officers were conducting the investigation at the apartment, Woody arrived at the apartment. *Id.* at 5. She was initially uncooperative and refused to give the officers her actual name, but later waived her *Miranda* rights and was interviewed by one of the officers. *Id.* at 5. Approximately two grams of methamphetamine, and a functional scale were found in Woody's purse. Woody told the officers that she is a user of methamphetamine and estimated she uses a ½ gram a day. Woody admitted to making multiple purchases of methamphetamine totaling approximately 55 grams. Day and Crisman both stated that Woody would purchase methamphetamine from them for herself as well as for others. *Id.* at 6. Woody contends she was only a user, and states "[a]lthough I have plead guilty to the charge of conspiracy, I continue to

assert my role as a simple 'user.' I agree to the facts that I shared drugs with one other person, and in essence 'pooled' their money and my own to purchase drugs." *Id.* at 6.

In the plea agreement, Woody stipulated that she should be held responsible for more than 500 grams but less than 1.5 kilograms of methamphetamine based on her knowledge of the conspiracy and her interactions with other defendants. *Id.* at 7. The Probation Office noted there were indications that she had been "pooling" her money with others to purchase drugs and those actions would be considered relevant conduct to her conviction. *Id.* It acknowledged, however, that there is no evidence to suggest that Woody was handling more than user quantities of methamphetamine.[1] *Id.*

Woody is forty-four years old. Her parents are college professors. *Id.* at 13. She did not have an unstable or abusive home life while growing up. *Id.* at 13-14. She has a Bachelor of Education degree and a Masters of Science degree. *Id.* at 16. She was previously employed as an educational grant coordinator and later as a waitress. *Id.* She was married for several years, but is now divorced, and has no children. *Id.* at 14.

Woody has been diagnosed as having major depressive disorder and methamphetamine abuse and addiction. *Id.* at 14-15. She has suffered from depression for twenty years. *Id.* at 14. She first used methamphetamine at age 30 and increased to daily use at age 32. *Id.* at 15. She was incarcerated from 2000 to 2003 as a result of her drug distribution conviction. *Id.* She abstained from methamphetamine while she was incarcerated and for two years after her release. *Id.* She reported that she relapsed six or seven times at age thirty-nine for one- or two-week periods. *Id.* Following a supervised release violation, she again abstained from

[1]Counsel for the government and the defendant all agreed that Woody's conduct in the conspiracy was minimal and that she was nothing more than a user in the overall scheme.

methamphetamine use from November 2008 to June 2009. *Id.* In June 2009, she began using methamphetamine on the weekends. *Id.*

Woody has been treated for substance abuse four times. *Id.* She successfully completed inpatient treatment at Valley Hope Association in 2000, but only remained drug free for two months. *Id.* She participated in an additional 14 days of treatment in 2000. *Id.* While incarcerated, she completed the Bureau of Prisons' Residential Drug and Alcohol Program. *Id.* She attended intensive outpatient treatment at Catholic Charities in 2006 and received individual counseling at Lutheran Family Services in 2006 and 2007. *Id.* She again attended inpatient substance abuse treatment at Valley Hope in 2008, but was removed from the program after 28 days due to fraternization with the opposite sex. *Id.* She indicates she is interested in continuing her participation in treatment and has requested placement in the Bureau of Prisons' Residential Drug and Alcohol Program. *Id.*

At the sentencing hearing, the government indicated that no motion for a reduction of sentence would be forthcoming because Woody's credibility was questionable. Woody moved for a downward departure and for a sentence outside the Guidelines.

## II. DISCUSSION

### A. Law

The Sentencing Guidelines are no longer mandatory and the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *See* *United States v. Booker,* 543 U.S. 220, 260-61 (2005); *Gall v. United States,* 552 U.S. 38, 59 (2007); *Kimbrough v. United States,* 552 U.S. 85, 101 (2007); *Rita v. United States,* 551 U.S. 338, 349-50 (2007); *Cunningham v. California,* 549 U.S. 270, 286-87 (2007). District courts must "give respectful consideration to

the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough*, 552 U.S. at 101 (quoting *Booker,* 543 U.S. at 245-246).

In imposing a sentence, the district court must consider the factors set out in the Sentencing Reform Act at 18 U.S.C. § 3553(a).[2] *Nelson v. United States,* 129 S. Ct. 890, 891-92 (2009). That statute "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)). Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, they are not the only consideration. *Gall,* 552 U.S. at 49. The sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors explaining any variance from the former with reference to the latter. *Nelson,* 129 S. Ct. at 891-92. "[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring). Further, the district court "may not presume

---

[2]Those factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and
  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the advisory guideline range;
(5) any pertinent policy statements issued by the Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at 50 (internal citation omitted); *Nelson*, 129 S. Ct. at 892 ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable") (emphasis in original).

The court can consider whether the guideline at issue exemplifies the Sentencing Commission's "exercise of its characteristic institutional role" which is "to formulate and constantly refine national sentencing standards." *Kimbrough,* 552 U.S. at 108-09; *Rita,* 551 U.S. at 349-50. When operating within that institutional role, the Sentencing Commission "has the capacity courts lack" and can "'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough,* 552 U.S. at 109 (quoting *United States v. Pruitt,* 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).

In formulating the Guidelines, the Commission developed and used data on past practices and recidivism. *See* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* ("Fifteen-Year Assessment") 72-73 (November 2004), available at http:// www.ussc.gov/ 15_ year/ 15_ year_ study_ full.pdf (last visited July 13, 2010); U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough,* 552 U.S. at 96; *Gall,* 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). The Commission established the offense levels for each crime, linked to a recommended imprisonment range, based on these sentencing statistics. Fifteen-Year Assessment at 14. Accordingly, in many cases the Guidelines represent a reasonable estimation of a fair sentencing range. *See* *Kimbrough,* 552 U.S. at 109.

When Guidelines are not the result of "the Commission's exercise of its characteristic institutional role," such as when they are not based on any identified empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita*, 551 U.S. at 350); *see also* *Gall,* 552 U.S. at 46 n.2. (noting that not all Guidelines are tied to empirical evidence). Consequently, the Guidelines that are not based on empirical evidence are a less reliable appraisal of a fair sentence. *See* *Kimbrough,* 552 U.S. at 109-110. In such cases, it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Kimbrough,* 552 U.S. at 110; *see also* *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (per curiam) (clarifying that "district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines"); *United States v. O'Connor*, 567 F.3d 395, 398, n.4 (8th Cir. 2009) (assuming without deciding that *Kimbrough's* holding extends beyond the crack-cocaine Guidelines).

Both for policy reasons and because Congress had enacted mandatory minimum sentences, the Commission departed from past practices in setting offense levels for drug crimes. Fifteen-Year Assessment at 15, 33. The Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for drug crimes, instead, the Commission attempted "to accommodate and, to the extent possible, rationalize mandatory minimum provisions established by the 1986 Anti-Drug Abuse Act" by anchoring the Guidelines to the mandatory minimum sentences. United States Sentencing Commission, *Special Report to Congress:*

*Mandatory Minimum Penalties in the Federal Criminal Justice System* ("Mand. Min. Rep't") Summary at ii; Rep't at 17 n.58 (August 1991), available at www.ussc.gov/reports.htm (last visited July 13, 2010); Fifteen-Year Assessment, Executive Summary at 15, 72-73; *Kimbrough,* 552 U.S. at 96-97.

The Commission thus adopted "the 1986 [Anti-Drug-Abuse] Act's weight-driven scheme that "uses the weight of the drugs involved in the offense as the sole proxy to identify 'major' and 'serious' dealers."[3] *Kimbrough,* 552, U.S. at 94-95. The resulting Guidelines ranges for drug trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory minimum sentences based on weight. *Gall,* 128 S. Ct. at 594 & n.2; *Neal v. United States*, 516 U.S. 284, 291-92 (1996) (noting that in spite of "incongruities between the Guidelines and the mandatory sentencing statute," the Commission developed Guidelines to parallel the mandatory minimum sentences set out in 21 U.S.C. § 841(b)(1), using the quantities and sentences derived from the statute and "[t]he weight ranges reflect the Commission's assessment of equivalent culpability among defendants who traffic in different types of drugs"); *Chapman v. United States*, 500 U.S. 453, 461 (1991) (stating that the Anti-Drug Abuse Act of 1986 provided for mandatory minimum sentences based on the weight of various controlled substances according to a "market-oriented" approach, creating a penalty scheme intended to severely punish large-volume drug traffickers).

Under the Guidelines, base offense levels for drug-trafficking crimes are determined by quantity. U.S.S.G. § 2D1.1(c), Drug Quantity Table. For sentencing purposes, the Guidelines

---

[3]Although both the mandatory minimum statutes and the Guidelines calibrate punishment of drug traffickers according to quantity, the Supreme Court has acknowledged that mandatory minimum sentences are both structurally and functionally at odds with the Guidelines and the goals that they seek to achieve, noting that "the guidelines produce a system of finely calibrated sentences with proportional increases whereas the mandatory minimums result in 'cliffs.'" *Neal v. United States,* 516 U.S. 284, 291 (1996). Nonetheless, the Supreme Court has continued to affirm the scheme, leaving it to Congress to correct its disparities. *Id.*; *United States v. LaBonte,* 520 U.S. 751, 764 (1997).

distinguish between two forms of methamphetamine powder—the pure drug (meth-actual) and a mixture of the drug with adulterants (meth-mixture)—and provide two methods for determining a defendant's base offense level in methamphetamine powder cases: (1) the weight of the actual methamphetamine contained within a mixture; or (2) the weight of the entire mixture containing a detectable amount of methamphetamine. U.S.S.G. § 2D1.1(c), Notes to Drug Quantity Table at ¶ (B); *see also* United States Sentencing Commission, *Methamphetamine - Final Report of the Methamphetamine Policy Team* ("1999 Methamphetamine Report") at 14 n.40 (November 1999), available at http://www.ussc.gov/research.htm (last visited July 12, 2010). The ratio between the penalties for distribution of a mixture or "cut" form of the drug and for distribution of the "pure" form is ten to one. *See* U.S.S.G. § 2D1.1(c) These alternative quantities of meth-actual and meth-mixture required for each base offense level in the Drug Quantity Table roughly correspond to the 10:1 ratio codified by Congress in the mandatory minimum penalty provisions applicable to methamphetamine offenses. Compare 21 U.S.C. § 841(b)(1)(A)(viii) & § 841(b)(1)(B)(viii) with U.S.S.G. § 2D1.1(c)(4) & (7) (Level 32 corresponds to the quantity that triggers a ten-year mandatory minimum and level 26 corresponds to a five-year mandatory minimum sentence); see also U.S.S.G. § 2D1.1, comment., n.10 ("The Commission has used the sentences provided in, and equivalences derived from, the statute (21 U.S.C. § 841(b)(1)), as the primary basis for the guideline sentences"); *Neal*, 516 U.S. at 292 (noting "the Commission has sought to make the Guidelines parallel to the scheme of § 841(b)(1) in most instances").

Noting that larger drug dealers were subject to a mandatory minimum of ten years for a first offense and twenty years for a subsequent conviction for the same offense, the Sentencing Commission stated that "[the Act] sought to cover mid-level players in the drug distribution chain by providing a mandatory minimum penalty of five years." *Id.* at 10. Later, in "[p]erhaps the most

far-reaching provision of the Omnibus Anti-Drug Abuse Act of 1988," Congress made the mandatory minimum penalties that were previously applicable to substantive distribution and importation/exportation offenses apply also to conspiracies to commit those substantive offenses, increasing "the potential that the applicable penalties could apply equally to the major dealer and the mid- or low-level participant." *Id.* at 10. The Commission's analyses show "that the sentences required by the guidelines above the minimums required by the [Anti-Drug Abuse Act] significantly increase the average prison term" for drug crimes. Fifteen-Year Assessment at 54.

The quantity thresholds linked to five- and ten-year sentences result in severe penalties for many street level sellers and other low culpability offenders. Fifteen-Year Assessment at 51. Evidence that the mandatory minimum statutes were resulting in lengthy imprisonment for many low-level, non-violent, first-time drug offenders led Congress in to enact a so-called "safety valve," which waived the mandatory penalties for certain categories of less serious offenders. *Id.* Also, the Commission acknowledges that drug quantity is often "based on potentially untrustworthy factors, such as the testimony of coconspirators" and that it "has been called a particularly poor proxy for the culpability of low-level offenders, who may have contact with significant amounts of drugs, but who do not share in the profits or decision-making." *Id.* at 50.

At the inception of the Guidelines, "the Commission sought to build mechanisms into the guidelines themselves that would help to ameliorate some of the effects of uneven charging," including the relevant conduct rule found at U.S.S.G. §1B1.3. *Id.* at 25. Designed to bring about "real offense" sentencing, the relevant conduct rule allows the court to consider facts beyond those specified in the indictment or in the elements of the offense of conviction. *Id.* at 26 (noting that "[t]his means, for example, that a defendant convicted of selling drugs to an undercover officer on one occasion is sentenced under U.S.S.G. §1D1.1 for the amount of drugs involved in

*all* the drug trafficking known to the court that was part of the same course of conduct or common scheme or plan as that one sale") (emphasis in original). The amount of drugs for which an offender is held accountable is determined by the relevant conduct rules and research suggests that there are significant disparities in how these rules are applied. Fifteen-Year Assessment at 50.

The "career offender" guideline, U.S.S.G. § 4B1.1, was also promulgated pursuant to congressional directive and "results in some of the most severe penalties imposed under the guidelines." *Id.* at 133. It places each offender with three violent or drug trafficking convictions in the highest criminal history category VI, and sets the offense level at the guideline range associated with the statutory maximum penalty for the offense. *Id.* Many offenders are subject to the guideline because of the inclusion of drug-trafficking crimes in the criteria qualifying offenders for the guideline. *Id.* The Commission notes that "preliminary analysis of the recidivism rates of drug trafficking offenders sentenced under the career offender guideline based on prior drug convictions shows that their rates [of recidivism] are much lower than other offenders who are assigned to criminal history category VI," and that "the recidivism rate for [drug-related] career offenders more closely resembles the rates for offenders in the lower criminal history categories in which they would be placed under the normal criminal history scoring rules in Chapter Four of the Guidelines Manual," thus the career offender guideline "makes the criminal history category a less perfect measure of recidivism risk than it would be without the inclusion of offenders qualifying only because of prior drug offenses." *Id.* at 134.

## B. Analysis

### 1. Initial Guidelines Calculation

The court generally accepts the facts set forth in the PSR and finds that Woody's offense level is 34 and her criminal history category is VI. Under the Guidelines, her imprisonment range is 262 to 327 months.

### 2. Departure

Amendments to the Guidelines that have been submitted to Congress and will become effective on November 1, 2010, will eliminate criminal history points for "recency" provided in subsection (e) of § 4A1.1. *See* 75 Fed. Reg. 27388-01, 27393 (May 14, 2010). Presently, one or two points are added to the criminal history score if the defendant committed the instant offense less than two years after release from imprisonment on another sentence, under § 4A1.1(e). As part of its continued review of criminal history issues, the Commission determined that "recent research isolating the effect of § 4A1.1(e) on the predictive ability of the criminal history score [with respect to contribution of recency points to the ability of the criminal history score to predict a defendant's risk of recidivism] and found that "consideration of recency only minimally improves the predictive ability." *Id.* The Commission noted that "public comment and testimony suggested that the recency of an offense to the defendant's release from imprisonment does not necessarily reflect increased culpability," and that the fact that "defendants who recidivate tend to do so relatively soon after being released from prison," reflects "the challenges to successful reentry after imprisonment rather than increased culpability." *Id.*

Also, the policy statements and application notes of the Guidelines will be amended to allow consideration of age, mental and emotional conditions, physical condition, and military service as grounds for departure under the Guidelines. *Id.* at 27390. Instead of stating that those

factors "are not ordinarily relevant in determining whether a departure is warranted," the amended policy statements "will generally provide that age, mental and emotional conditions, and physical condition (including drug or alcohol dependence or abuse) or appearance, including physique, may be relevant in determining whether a departure is warranted, if [the condition], individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." *Id.* Further, the amendments to the Guidelines will provide that "in certain cases a downward departure may be appropriate to accomplish a specific treatment purpose," including departing "from the sentencing options authorized for Zone C (under which at least half the minimum term must be satisfied by imprisonment) to the sentencing options authorized for Zone B (under which all or most of the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) to accomplish a specific treatment purpose. *Id.* at 27389-90 (noting that "[some public comment, testimony, and research suggested that successful completion of treatment programs may reduce recidivism rates and that, for some defendants, confinement at home or in the community instead of imprisonment may better address both the defendant's need for treatment and the need to protect the public").

Under the Guidelines presently in force, the court finds that Woody is not entitled to a downward departure. However, under the Guidelines amendments that will become effective on November 1, 2010, the court would have been able to consider Woody's mental health and addiction as grounds for a Guidelines departure. Further, although, as a career offender, the exclusion of criminal history points for recency would not have made a difference in Woody's Guidelines range, the proposed amendments show that the criminal history points added for recency are of little use in determining Woody's likelihood of recidivism. Accordingly, these

factors will be addressed in connection with the defendant's motion for a variance under 18 U.S.C. § 3553(a).

### 3. Section 3553 factors

In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of 120 months (the statutory minimum) is sufficient, but not greater than necessary to accomplish the goals of sentencing in this case. The court will accordingly grant Woody's motion for a sentence outside the Guidelines.

With respect to the nature of the offense, the court notes that conspiracy to distribute methamphetamine is undoubtedly a serious offense. However, in the context of the conspiracy, Woody's conduct in connection with the conspiracy was minimal. Had she not been classified as a career offender, she would have been entitled to at least a two-level, if not a four-level, reduction in her Guidelines offense level as the result of her limited role. There is no evidence that Woody was anything more than a small player in the methamphetamine distribution enterprise. It is undisputed that she was at the lowest level within the hierarchy.

The government acknowledges that Woody was nothing more than a user who occasionally shared methamphetamine and it would not have objected to classifying her as a minor participant. Under the Guidelines market-based approach, where the defendant falls within the hierarchy of a drug distributing or manufacturing conspiracy is an important consideration. Woody's role was minor and it is clear that she was generally motivated by the need to feed her addiction, rather than to profit from the enterprise. Woody agreed to be held responsible for a quantity far in excess of the quantity that could be attributed to her individually. In view of her attenuated role in the conspiracy, the quantity attributable to the overall conspiracy is not a reliable proxy for Woody's culpability.

The court has also considered the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). Woody is a highly-educated person. She has a college degree, as well as a masters degree. She is the product of a relatively stable home. Although she may not have endured the hardships in life typical of many drug offenders, she has struggled against drug addiction for many years. She has undergone treatment for her addiction four times. She has been diagnosed with severe depression and has been prescribed various medications. The court finds that Woody's serious and long-standing addiction must be considered in determining a fair sentence.

The court is sadly familiar with Woody's criminal history, having sentenced her in connection with a previous drug distribution conviction and following relapses during supervision. As a result of her relapse, she again became involved with drugs and began associating with a criminal element. However, the court notes that Woody is far less involved in this conspiracy than she was in the last. Further, the court finds that, by virtue of the career-offender classification, Woody's criminal history category overstates her criminal conduct. Although technically she meets the criteria for classification as a career offender under the Guidelines, in that she has three felony convictions for drug distribution or crimes of violence, she is not a typical career offender. The career offender guideline is aimed at offenders who depend on criminal activity for their livelihood. *See* 28 U.S.C. § 994(d)(11); U.S.S.G. § 5H1.9. Woody does not fit that mold. Her violent felony conviction was for an offense, burglary of a storage unit, that is less serious than most crimes that are characterized as violent. Also, Woody's previous drug distribution conviction, as well as her present conviction, are reflections of her drug dependence.

Woody's significant and intractable history of drug dependence and abuse lessens her culpability to some extent. Though not fully successful, Woody has made numerous attempts at controlling her addiction and has made some progress in maintaining sobriety. The court

appreciates the difficulty of a defendant's overcoming a long-standing addiction, especially to methamphetamine. Woody has continued to seek and obtain treatment and expresses a desire to undergo additional treatment while incarcerated. The court can envision a positive result for Woody if she can manage to overcome her addiction. In these circumstances a sentence of ten years is sufficient, but not longer than necessary, to achieve the purposes of sentencing. The court finds that the 22 to 27-year sentence contemplated by the Guidelines is excessively harsh for this defendant, in terms of both her offense conduct and her criminal history.

In formulating Woody's sentence, the court has considered the sentencing range established by the Guidelines, but, because the drug offense Guidelines and the career offender provisions were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would empirically-grounded Guidelines. Also, the Guidelines calculation is driven by drug quantity, which in this case has a substantial impact on Woody's sentence. Quantity can be one measure of the seriousness of a drug offense in the Guidelines market-based scheme, but when combined with a conspiracy offense involving multiple participants and an extended period of time, it is not always a trustworthy measure of the culpability of an individual defendant. To sentence Woody as responsible for such a substantial quantity would exaggerate her culpability and would not be an accurate measure of her blameworthiness vis-a-vis the other participants in the scheme.

The calculation of Woody's sentence is driven by consideration of relevant conduct, which is designed to ameliorate the effects of uneven charging and plea bargaining decisions. In this case, as discussed below in connection with the sentences of co-defendants, it does just the opposite. As the result of charging and plea bargain decisions, Woody, arguably the least culpable defendant, would receive the longest sentence under the Guidelines. Such a result would not promote respect for the law.

This sentence also satisfies the need to avoid unwarranted sentencing disparities. The drug conspiracy at issue involved co-defendants Christopher Day, Roseann Crisman, James E. Gibson, and Felix Alarcon, as well as Robynn Hebda (8:10CR15), Eduardo Morales-Nunez and Grace Morales (8:10cr14), and Benjamin Chenier (8:10CR131). At the sentencing hearing, the government agreed that Day, Alarcon, Hebda, Morales-Nunez, Morales, Chenier and Crisman were all suppliers and that Gibson and Woody were users. All were charged with conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a charge that carries a ten-year mandatory minimum sentence.

Day, Alarcon, and Crisman all entered into cooperation agreements and will likely receive substantial sentence reductions. Filing Nos. 100, 115, and 117 Plea Agreements (sealed). Hebda also entered into a cooperation agreement and though she has not yet been sentenced, it is not likely that she will receive a sentence longer than 120 months. *See* 8:10CR15, Filing No. 22. It is anticipated that Eduardo Morales-Nunez's Guidelines sentencing range will be 70 to 87 months and he has agreed to forfeit his house to the government in a cooperation agreement. *See* 8:10CR14, Filing No. 49, Plea Agreement of Eduardo Morales-Nunez, Filing No. 51, preliminary order of forfeiture. Benjamin Chenier has not tendered a guilty plea and his case will proceed to trial. His anticipated Guidelines sentencing range is also 70 to 87 months. Grace Morales agreed to enter a plea of guilty to the drug conspiracy charge and the government agreed that she will be eligible for a sentence below the mandatory minimum by virtue of application of the "safety valve" under 18 U.S.C. § 3553(f). *See* 8:10CR14, Filing No. 43, Plea Agreement of Grace Morales. James Gibson also received the benefit of the "safety-valve" and was sentenced to 70 months under the Guidelines. Filing No. 140, Judgment at 2.

Ten years is either equal to or greater than the sentences of all the other co-conspirators, even those far more culpable than Woody. To sentence Woody, as a user, to a significantly

longer term of imprisonment than her suppliers would not be proportionate in light of her culpability and would not promote respect for the law. The co-conspirator whose conduct most closely parallels Woody's was sentenced to 70 months (close to six years). A ten-year sentence is more than twice the amount of time Woody served for her last drug distribution conviction. Although logically she should receive more time as a recidivist, that fact is tempered somewhat by Woody's far lower level of involvement in this drug distribution scheme.

This sentence also satisfies the purposes of sentencing. Because drug distribution is a serious offense, significant terms of incarceration are necessary, especially for repeat offenders. A sentence of ten years reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. This is a significant sentence and will be sufficient to deter others from engaging in similar criminal conduct. The deterrent value of a longer term would be marginal. The need to protect society from further crimes of the defendant is addressed by the court's imposition of supervised release. Moreover, if Woody can overcome her addiction, she is not likely to re-offend. This sentence will hopefully provide her with needed substance abuse treatment.

A Judgment and Commitment and a Statement of Reasons in conformity with this Sentencing Memorandum will issue this date.

DATED this 20th day of July, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.